

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (Bar No. 144074)
Eric Valenzuela, Esq. (Bar No. 284500)
dalekgalipo@yahoo.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California  91367
Telephone:   (818) 347-3333

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.S., a minor by and through her Guardian Ad Litem SHAMEKA MOORE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES et al.,<br><br>Defendants. | Case No. CV 23-6334 FMO (SSCx)<br><br>**DECLARATION OF DALE K. GALIPO IN SUPPORT OF PETITION FOR COMPROMISE OF THE CLAIMS OF T.S. A MINOR, BY AND THROUGH HIS GUARDIAN AD LITEM, SHAMEKA MOORE** |

## DECLARATION OF DALE K. GALIPO

I, Dale K. Galipo, hereby declare as follows:

1.    I am an attorney licensed to practice law in this United States District Court.  I am the attorney of record for the Plaintiffs in this action, CV 23-6334 FMO (SSCx).  I have personal knowledge of the matters stated herein and would and could testify competently thereto if called.  I make this declaration in support of Plaintiff's Petition for Compromise of the Claims of T.S., a Minor, by and through his Guardian Ad Litem, Shameka Moore.

2.      The instant claims of minor Plaintiff T.S. arose out of the fatal shooting of his father, decedent Takar Smith, on January 2, 2023, by City of Los Angeles police officers Joseph Zizzo and Nicolas Alejandre.  The parties recently reached a settlement agreement which obligates Defendants to pay to the Plaintiffs and their attorney of record the total sum of $6,00,000.  One payment of $3,000,000 this year and another payment of $3,000,000 next year.

3.      The following is a description of the breakdown submitted to the Court for approval:

| | |
|---|---|
| TOTAL SETTLEMENT: | $6,000,000[1] (which includes the claims of three minor Plaintiffs, T.S., T.S., and T.S. and five adult Plaintiffs, Shameka Moore; Takarra Smith; Takoya Smith; Takar Smith Jr. and Alecia Smith,) |
| FIRST PAYMENT IN 2024 | $3,000,000 |
| MINOR T.S.'s PORTION: | $400,000 |
| MINOR T.S.'s PORTION: | $400,000 |
| MINOR T.S.'s PORTION: | $400,000 |
| SHAMEKA MOORE'S PORTION: | $400,000 |
| TAKARRA SMITH'S PORTION: | $400,000 |

[1] The settlement is being divided into two separate payments.  One payment of $3,000,000 by this year and another payment of $3,000,000 by next year.  In order to lock in the rates for the annuity, Plaintiffs' broker has informed them that the annuity company needs to receive the funds by September 30, 2024.

TAKOYA SMITH'S
PORTION:                              $400,000

TAKAR SMITH JR.'S
POTION:                               $400,000

ALECIA SMITH'S
PORTION:                              $200,000

TOTAL COSTS:                          Waived by Plaintiffs' counsel

TOTAL ATTORNEY FEES CHARGED to MINOR T.S.,
MINOR T.S., MINOR T.S., SHEMEKA MOORE,
TAKARRA SMITH, TAKOYA SMITH and TAKAR SMITH JR.;

                                      $160,000 (40% of recovery) each

TOTAL ATTORNEY FEES
CHARGED TO
ALECIA SMITH:                         $80,000 (40 % of recovery)

TOTAL RECOVERY FOR
MINOR T.S.:                           $240,000

TOTAL RECOVERY FOR
MINOR T.S.:                           $240,000

TOTAL RECOVERY FOR
MINOR T.S.:                           $240,000

TOTAL RECOVERY FOR
SHAMEKA MOORE:                        $240,000

TOTAL RECOVERY FOR
TAKARRA SMITH:                        $240,000

TOTAL RECOVERY FOR
TAKOYA SMITH:                         $240,000

TOTAL RECOVERY FOR
TAKAR SMITH JR.:                    $240,000

TOTAL RECOVERY FOR
ALECIA SMITH:                       $120,000

4.    Plaintiffs signed a retainer providing for attorney fees of 40% of any settlement after filing a lawsuit, so Plaintiffs' counsel's total fee for representing the minor is $160,000 (or 40% of $400,000), to be split or shared equally between the Law Offices of Dale K. Galipo and the Law Offices of Gregory A. Yates.

In order to prosecute the Plaintiffs' action, Plaintiffs' counsel advanced the litigation costs. However, Plaintiffs' counsel has voluntarily waived all litigation costs for the Plaintiffs.

5.    Minor Plaintiff T.S. is a 10-year-old male born on October 14, 2013, to Shameka Moore and decedent Takar Smith.

6.    Minor claimant T.S. has suffered injuries as a result of the loss of his father. The minor Plaintiff is deprived of and will continue to suffer a deprivation of his familial relationship with his father.

7.    Medical treatment is not relevant.

8.    The total amount of the settlement that Defendants agree to pay is $6,000,000, which will be made in two payments, one payment of $3,000,000 this year and another next year for $3,000,000. Plaintiffs' counsel, the Law Offices of Dale K. Galipo, is requesting attorney's fees of 40 percent of the $400,000 portion of the settlement for the minor Plaintiff, to be shared with the Law Offices of Gregory A. Yates. The Plaintiffs signed a retainer providing for attorney fees of 40% of the total recovery, so counsel's total fee for representing the minor is $160,000 (or 40% of $400,000). This amount is being split between two separate law firms which both represented the Plaintiffs throughout the litigation.

1        Attorneys at the Law Offices of Dale K. Galipo have expended numerous

2    hours litigating this case and this case involved a substantial amount of risk.  This

3    case involved an exceptional amount of risk for Plaintiffs' counsel due to the fact

4    that Decedent had a restraining order against his wife, Shameka Moore, for seriously

5    injuring her during a previous domestic violence incident, Decedent was armed with

6    a knife and he refused several commands to drop the knife, the officers first

7    attempted to use the taser gun on Decedent before shooting him, there was evidence

8    that Decedent had used methamphetamine shortly before he was shot, there was

9    gang evidence, Decedent had a violent criminal history and Decedent had spent

10   significant amounts of time incarcerated.  Importantly, Decedent was caught on

11   video holding a knife that he refused to drop even after LAPD officers ordered him

12   several times to drop the knife and even used multiple taser gun applications against

13   Decedent before ultimately shooting him while he was still armed with the knife.

14       This difficult case was vigorously defended by the City of Los Angeles and

15   by a private defense firm which represented the individual Defendant Officers.

16   Both of the involved officers claimed that they were in fear for their lives because

17   they believed that Decedent was going to stab them or a fellow officer with the large

18   knife he was holding and refused to drop, even after being tased multiple times.  If

19   the Law Offices of Dale K. Galipo were not awarded a fully compensatory fee in

20   such cases, it would not be able to take them.  In turn, minor plaintiffs such as T.S.

21   would not be able to attract competent counsel who could achieve similar results.  I

22   was last approved an hourly rate of $1400 per hour (2024).  Further, due to my

23   history and reputation for winning difficult cases involving weapons such as guns

24   and knives, including multiple eight figure verdicts against the City of Los Angeles,

25   Plaintiffs were able to secure a $6,000,000 settlement in a difficult case with some

26   very negative evidence.

27

28

DECLARATION OF DALE K. GALIPO IN SUPPORT OF PETITION FOR ORDER APPROVING MINOR'S COMPROMISE

9.      The gross amount of the total proposed settlement is $6,000,000, being paid in two payments of $3,000,000 this year, and another $3,000,000 next year. T.S.'s gross amount of the settlement is $800,000, which will be paid in two separate payments, with one payment of $400,000 this year and another of $400,000, next year.  After deducting the requested attorneys' fees of $160,000, the total net settlement proceeds to minor plaintiff is $240,000, for the first payment. Minor plaintiff will receive another net settlement payment of $240,000, next year, for a total net settlement of $480,000.  Petitioner agrees to this sum.

10.     It is requested that the $240,000 (the net settlement amount to minor Plaintiff) be used to fund a structured settlement annuity for the minor Plaintiff.  The annuity will be disbursed to him, tax-free, at six intervals between the age of 18 and 28.  Attached hereto as "**Exhibit A**" is a true and correct copy of the structured settlement annuity funded in the amount of $240,000– that provides the amount, interval, and date of each payout to the minor from the age of 18 to 28.  This proposal is agreed to by Petitioner, Shameka Moore, the court-appointed guardian ad litem for the minor Plaintiff.

The structured settlement annuity provides T.S., age 10, guaranteed tax-free disbursements totaling $379,020 (not including monthly payments of $300).

11.     The structured settlement annuities will be administered, paid, and guaranteed by Metropolitan Tower Life Insurance Company ("MetLife").  Attached hereto as "**Exhibit B**" is a true and correct copy of Metlife's ratings sheet.  Metlife and its core entities are rated A+ Superior by A.M. Best, AA- Very Strong by S&P, and Aa3 High Quality by Moody's.

12.     Attached hereto as "Exhibit C" are specimen of the Metlife's Corporate Guaranty and Contract Guarantee were this Court to approve this Petition.

13.     Under the settlement agreement, only Plaintiffs T.S., T.S., Shameka Moore, Takarra Smith, Takoya Smith, Takar Smith Jr., would also receive

disbursements in the amount of $480,000, each ($240,000 this year and the remaining $240,000 next year) and Alecia Smith would receive a disbursement of $240,000 ($120,000 this year and the remaining $120,000 next year)

14.    Petitioner, the moving guardian ad litem, does have claims against Defendants in connection with the subject incident as the wife of the Decedent.

15.    Petitioner, the moving guardian ad litem, does not have any claims against the minor Plaintiff in connection with the subject incident.

16.    California Welfare and Institutions Code Section 14124.73 does not apply.

17.    This motion does not seek an order for payment of money to a special needs trust.

18.    I prepared this petition for approval of the minor's compromise. The Law Offices of Dale K. Galipo did not become concerned with this matter at the instance of any party against whom the claim of said minor is asserted.  The Law Offices of Dale K. Galipo represents all Plaintiffs in Case No. CV 23-6334 FMO (SSCx), including the minor Plaintiff in this matter but is not employed by any other party or any insurance carrier involved in the matter.  The Law Offices of Dale K. Galipo has not received any compensation for its services in connection herewith from any person.

19.    The only other source The Law Offices of Dale K. Galipo will receive additional compensation for their services in connection herewith is from Plaintiffs T.S., a minor, T.S., a minor, Shameka Moore, Takarra Smith, Takoya Smith, Takar Smith Jr. and Alecia Smith in the total amount of $2,080,000 ($1,040,000 this year and the remaining $1,040,000 next year) in attorney's fees, which is being split with co-counsel the Law Offices of Gregory A. Yates.

20.    The Law Offices of Dale K. Galipo accepted this engagement for a contingency fee, plus reimbursement for any costs advanced.  The retainer

agreement provides for a 40 percent attorney fee recovery, and I have voluntarily waived all litigation costs.

I certify under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 20th day of August, 2024, at Woodland Hills, California 91367.

_____/s/ Dale K. Galipo_____
Dale K. Galipo

# EXHIBIT A

## ATTACHMENT TO MINORS COMPROMISE
## FOR T.I.S.

From the total gross settlement, the City of Los Angeles (hereinafter referred to as "Defendant") has agreed to issue a separate settlement check in the amount of $240,000.00 to fund and the structured annuity for the minor Plaintiff T.I.S., by and through her Guardian ad Litem Shameka Moore.

The annuity check will be made payable to MetLife Assignment Company, Inc. (hereinafter referred to as "Assignee") which will provide the following periodic payments in Section A to be made by Metropolitan Tower Life Insurance Company, (hereinafter referred to as "Annuity Carrier") rated A+ Class XV by A.M. Best Company.

The details of the periodic payments will be set forth in section (A), hereinbelow. All sums and periodic payments set forth in the section entitled Payments constitute damages on account of personal physical injuries or physical illness, arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

    A)    Payments:

### Periodic payments payable to T.I.S. :

$63,170.00 Lump Sum Payment on 10/14/2031
$63,170.00 Lump Sum Payment on 10/14/2033
$63,170.00 Lump Sum Payment on 10/14/2035
$63,170.00 Lump Sum Payment on 10/14/2037
$63,170.00 Lump Sum Payment on 10/14/2039
$63,170.00 Lump Sum Payment on 10/14/2041

### Periodic payments payable to Shameka Moore (as Parent and Guardian):

$300.00 Payable Monthly, Guaranteed for 7 years,
Commencing on 11/1/2024 with the last payment on 10/1/2031

The Defendant will execute a "qualified assignment" within the meaning of Section 130(c), of the Internal Revenue code of 1986, as amended, to Assignee, of the Defendant's liability to make the periodic payments described in paragraph (A) herein. Such assignment, if made, shall be accepted by the Plaintiff without right of rejection and shall completely release and discharge the Defendant from such obligations hereunder as are assigned to Assignee.

The Defendant shall have the right to fund its liability to make periodic payments by purchasing a "qualified funding asset", within the meaning of Section 130(d) of the Code, in the form of an annuity policy from the Annuity Carrier.

The obligation assumed by Assignee with respect to any required payment shall be discharged upon the mailing on or before the due date of a valid check or via wire transfer, in the amount specified above.

The Plaintiff hereto expressly understands and agrees that upon the qualified assignment being made by the Defendant to Assignee as authorized by this agreement, all of the duties and responsibilities to make the periodic payments otherwise imposed upon the Defendant by this agreement shall instead be binding upon Assignee, and the Defendant shall be released from all obligations to make said periodic payments, and Assignee shall at all times remain directly and solely responsible for and shall receive credit for all such payments made to Plaintiff. It is further understood and agreed that, upon such a qualified assignment, Assignee assume all of the duties and responsibilities of the Defendant to make the periodic payments.

Payments hereunder cannot be accelerated, deferred, increased or decreased by the Plaintiff and/or Assignee and no part of the payment(s) called for herein or any assets of the Defendant and/or Assignee is to be subject to execution of any legal process for any obligation in any manner. Furthermore, the Plaintiff shall not have the power to sell or mortgage or encumber the same, or any part thereof, anticipate the same, or any part thereof, by assignment or otherwise.

The Assignee shall be the owner of the annuity policy or policies, and shall have all rights of ownership. The Assignee will have the Annuity Carrier mail payments directly to the Plaintiff. The Plaintiff shall be responsible for maintaining the currency of the proper mailing address and mortality information to Assignee.

# EXHIBIT B

 **MetLife** | Retirement & Income Solutions

Financial Quality

# Metropolitan Tower Life Insurance Company (Met Tower Life)

A wholly owned subsidiary of MetLife, Inc.[1]
Data as of December 31, 2019

## Size and strength of Met Tower Life

Met Tower Life can assume responsibility for annuity contracts of all sizes.

On a statutory accounting basis, Met Tower Life has approximately $26.3 billion in total admitted assets (including separate accounts and approximately $3.1 billion pledged as collateral for any loan or guaranty or which were otherwise not available to pay losses and claims or were not held to protect its policyholders or creditors) and approximately $24.8 billion in liabilities (as of December 31, 2019).

| Met Tower Life's size (As of December 31, 2019) | ($ millions) | | ($ millions) |
|---|---|---|---|
| General account total cash & invested assets | $18,807 | Liabilities | $24,812 |
| Total general account assets | $19,568 | Capital & surplus | $1,503 |
| Separate account assets | $6,747 | **Total liabilities, capital and surplus (excluding AVR)** | **$26,315** |
| **Net admitted assets** | **$26,315** | Asset valuation reserve (AVR) | $182 |
| | | **Total Capital\*** | **$1,685** |

\*Total capital is comprised of "capital & surplus" and "asset valuation reserve (AVR)."

**Note:** Categories may not equal total due to rounding.

## Rating agency assessments

Metropolitan Tower Life Insurance Company's financial strength and claims-paying ability is currently rated "Superior", "Very strong" or "High quality" by the following major rating agencies.[2]

| Agency | Financial strength rating |
|---|---|
| A.M. Best | A+ (Superior) |
| Fitch | AA− (Very strong) |
| Moody's | Aa3 (High quality) |
| Standard & Poor's | AA− (Very strong) |

## Capital to protect benefit payments

Met Tower Life's total statutory capital and surplus (including asset valuation reserves) is approximately $1.7 billion (as of December 31, 2019).

## Met Tower Life businesses

Met Tower Life has a diversified mix of business.

The majority of Met Tower Life's legacy business is individual life insurance, which has been in force for many years. This legacy life insurance business acts as a natural hedge for our annuity business. Additionally, Met Tower Life's in-force business is predominantly not composed of products typically associated with earnings volatility, such as long term care insurance. Today, in addition to group annuities for pension risk transfer, Met Tower Life issues for MetLife's Retirement & Income Solutions business institutional income annuities, structured settlement annuities, stable value guaranteed investment contracts, and corporate- and bank-owned life insurance. Prospectively, it will issue funding agreements.[3]

| Business mix (as of December 31, 2019) | Liability amount ($ millions) | Percentage |
|---|---|---|
| Life | $10,393 | 68% |
| Deposit type contracts | $2,820 | 19% |
| Individual annuities | $1,800 | 12% |
| Other* | $191 | 1% |
| Group annuities | $9 | 0% |
| **Total policy holder liabilities** | **$15,214** | **100%** |

*Includes accidental death riders on life insurance policies, disability, accident & health, and other miscellaneous reserves.

**Note:** Categories may not equal total due to rounding.

## General account investment portfolio

$18,807 million, as of December 31, 2019



- Bonds: 66.9%
- Mortgage loans: 15.5%
- Policy loans: 9.4%
- Cash & short-term investments: 1.8%
- Real estate: 1.3%
- Stocks: 0.4%
- All other assets: 4.8%*

\* Includes derivatives, receivables for securities, and other invested assets.
**Note:** Categories may not total 100% due to rounding.

| General account invested assets as of December 31, 2019 | ($ millions) |
|---|---|
| Bonds | $12,579 |
| Mortgage loans | $2,920 |
| Policy loans | $1,763 |
| Cash & short-term investments | $338 |
| Real estate | $238 |
| Stocks | $70 |
| All other assets* | $899 |
| **Total invested assets** | **$18,807** |

\* Includes derivatives, receivables for securities, and other invested assets.
**Note:** Categories may not equal total due to rounding.

As of December 31, 2019, 94.99% of Met Tower Life's bond portfolio was investment grade.

## Bond quality

$12,579 million, as of December 31, 2019



- Investment grade (NAIC class 1–2): 94.99%
- Medium grade (NAIC class 3): 3.77%
- High yield (NAIC class 4–6): 1.24%

**Note:** Categories may not total 100% due to rounding.

## About Metropolitan Tower Life Insurance Company

MetLife's Retirement & Income Solutions division, the company's institutional retirement business, issues products through Metropolitan Life Insurance Company and Metropolitan Tower Life Insurance Company, two wholly owned subsidiaries of MetLife, Inc. Retirement & Income Solutions issues products for transferred pension liabilities, stable value, institutional income annuities, benefits funding and structured settlements.

On April 27, 2018, Metropolitan Tower Life Insurance Company (Met Tower Life) was re-domesticated to Nebraska, and General American Life Insurance Company, another MetLife, Inc., subsidiary, was merged with and into Met Tower Life. Met Tower Life is licensed in all 50 states. MetLife believes that being able to write new contracts out of Met Tower Life will allow it to offer its customers more competitive pricing and enable maximum flexibility from a regulatory standpoint, while ensuring that participant benefits are protected by another financially strong MetLife insurance operating company.

**Safe Harbor Statement**

This document may contain or refer to forward-looking statements. Forward-looking statements give expectations or forecasts of the future using terms such as "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," "will," and other terms tied to future periods. Results could differ materially from those expressed or implied in the forward-looking statements. Forward-looking statements are based on assumptions and expectations. They involve risks and uncertainties, including the "Risk Factors" MetLife, Inc. describes in its U.S. Securities and Exchange Commission filings. The company has no obligation to correct or update any forward-looking statement. Parts of this document may include additional information on forward-looking statements.

The document may also contain measures that are not calculated based on accounting principles generally accepted in the United States of America, or GAAP.  Parts of this document, the Investor Relations portion of MetLife's website (www.metlife.com), or other parts of that website include information on non-GAAP financial information.

[1]MetLife, Inc., is also the holding company parent of Metropolitan Life Insurance Company (MLIC) and other MetLife affiliates.

[2]Current as of March 16, 2019. Ratings apply to Met Tower Life's financial strength and claims-paying ability and not the performance of any of its products. For current ratings and a more complete analysis of the financial strength of Met Tower Life, please go to https://www.metlife.com/about-us/corporate-profile/ratings/.

[3]Guarantees are subject to the financial strength and claims-paying ability of Metropolitan Tower Life Insurance Company.

This brochure is not intended to be, and should not be construed as, legal and/or tax advice. You should consult with your independent legal and tax advisors in connection with your consideration of purchasing an annuity to transfer plan liabilities.

Navigating life together

**metlife.com**



**Metropolitan Tower Life Insurance Company**  |  5601 South 59th St  |  Lincoln, NE 68516
1711 934256C   L0320002399[exp0521][All States][DC]   © 2020 MetLife Services and Solutions, LLC

# EXHIBIT C



Metropolitan Tower Life Insurance
Company
New York, NY

## EVIDENCE OF GUARANTEE

Pursuant to authority granted by its Board of Directors, Metropolitan Tower Life Insurance Company ("MetLife") has agreed to guarantee any payment or other obligation required to be made or performed by MetLife Assignment Company, Inc., a wholly owned subsidiary of MetLife, on or after May 15, 2017 in connection with the purchase of annuities from MetLife.

Andrew T. Aoyama
Senior Vice President
Metropolitan Tower Life Insurance Company

# Metropolitan Tower Life Insurance Company

A Stock Company
[1209 Orange Street
Wilmington, DE 19801]

**NOTICE**
To obtain information about the Contract or if you, the Owner, need assistance or need help in resolving a complaint, you may call [**(800)-638-2704**]

Metropolitan Tower Life Insurance Company (referred to as "We, Us and Our") will make payments as described in this Contract in the Payments Schedule section on the Contract Specifications.

This Contract is issued in return for the payment of the Single Premium.

***FREE LOOK PROVISION – RIGHT TO CANCEL***
**This Contract may be returned for any reason within [10] days after the Owner receives it by mailing or otherwise surrendering the Contract to either Us or the agent who sold it together with a written request for cancellation.  Return of this Contract by mail is effective on being postmarked, properly addressed and postage prepaid.  If the Owner returns it within the [10] day period, the Contract will be cancelled.  We will promptly refund the Single Premium, less any prior payments made by us.**

Signed for the Company.

[
Tyla  L. Reynolds
Vice President and Secretary

Robin Lenna
President
]

**[Notice**
**This Contract has been delivered to the possession of John Doe for the sole purpose of perfecting a lien and security interest of such person in this Contract. John Doe is not the Owner of, and has no ownership rights in this Contract and cannot anticipate, sell, assign, pledge, encumber, or otherwise use this Contract as any form of collateral. Please contact us for further information.]**

*INDIVIDUAL SINGLE PREMIUM SETTLEMENT ANNUITY CONTRACT*

*NON-PARTICIPATING*

*THIS CONTRACT DOES NOT PROVIDE ANY CASH SURRENDER VALUES*

*READ THE CONTRACT CAREFULLY*

Form 8.I.1000

# TABLE OF CONTENTS

Contract Specifications                                              [Page 3

Definitions                                                          Page 4

General Provisions                                                   Page 5-7

    Cash Value                                   Page 5
    Ownership
    Payments
    Change of Payee or Beneficiary
    Contestability

    Misstatement                                 Page 6]
    Nonassignability; Claims of Creditors
    Proof of Living/Death
    Non-Participating
    Entire Contract

2

Form 8.I.1000

CONTRACT SPECIFICATIONS

OWNER:                      [ABC Assignment Company]

MEASURING LIFE:      [John Jones         **SEX:** [M]      **DATE OF BIRTH: [**07/13/1957]

[JOINT  MEASURING      [Mary Jones        **SEX:** [F]      **DATE OF BIRTH: [**06/22/1960]]
LIFE:]

CONTRACT    [12345]                                    ISSUE DATE:
NUMBER:                                                 [06/01/2017]

**PAYMENTS SCHEDULE:**
[
1)  [$XXX.XX] for life, payable monthly. Payments starting on [XX/XX/20XX]. Payments will cease upon the death of the Measuring Life.

2)  [$XXX.XX] for Life, payable monthly, guaranteed for [XX] years. Payments starting on [XX/XX/20XX] with last guaranteed payment on [XX/XX/20XX]. We will pay the payments for as long as the Measuring Life lives. Payments will cease upon the later of the death of the Measuring Life and the last guaranteed payment date. If the Measuring Life dies before the last guaranteed payment date, the remaining guaranteed payments will continue to the Beneficiary until that date.]

3

## DEFINITIONS

1.  "We, Us, Our" means Metropolitan Tower Life Insurance Company.

2.  "Contract" means this Contract excluding any additional benefit for which a separate premium is charged.

3.  "Our Office" means the Home Office, [1209 Orange Street, Wilmington, DE 19801] (Mailing address:  [P.O. Box 14403, Lexington, KY  40512-4403]) or any other office which We may name for the purpose of administering this Contract.

4.  "Measuring Life" is the person whose life is used to calculate the payments shown under the Payments Schedule on the Contract Specifications Page.  The Measuring Life is shown on the Contract Specifications page.

5.  "Joint Measuring Life" is the person whose life is used in combination with the life of the Measuring Life to calculate payments, if a Joint Measuring Life payment option is selected and shown under the Payments Schedule on the Contract Specifications Page. The Joint Measuring Life, if any, is shown on the Contract Specifications page.

6.  "Payee" is the person(s), or entity(ies), to whom payments shown under the Payments Schedule on the Contract Specifications Page will be made.  The Payee is named by the Owner in the application or in a later designation.

7.  "Beneficiary" is the person shown on the application, or by later designation, to receive the remaining guaranteed payments upon the death of the Measuring Life and Joint Measuring Life, if any, as described under the Payments Schedule on the Contract Specifications Page.

4

## GENERAL PROVISIONS

Cash Value
This Contract does not have cash or surrender values.

Ownership
The contract owner ("Owner") is the person or entity shown on the application and the Contract Specifications page.

The Owner may exercise all rights provided in this Contract prior to the death of the Measuring Life and, if any, the Joint Measuring Life; provided however that the Owner may not change the Measuring Life and/or the Joint Measuring Life, after the Issue Date.

Payments
We will pay the Owner, or such person(s) as the Owner may designate as the Payee, the payments specified under the Payments Schedule on the Contract Specifications page. The Owner may not change the payment type or frequency after the Issue Date.

Beneficiary
Upon the last death of the Measuring Life, and, if any, the Joint Measuring Life, We will pay the Beneficiary the remaining guaranteed payments, if any, specified in the Payments Schedule on the Contract Specifications Page. If two or more Beneficiaries are designated and alive when payment is due, payment will be made in equal shares to them unless stated otherwise. The Beneficiary may not assign any payment to be paid to the Beneficiary under this Contract.

If any Beneficiary dies before the Measuring life, and if any, the Joint Measuring Life, that Beneficiary's interest will pass to any other Beneficiary or contingent beneficiary, if any, as named in the application. If guaranteed payments are being made to the last surviving Beneficiary, and such Beneficiary dies before all guaranteed payments have been made, such payments will be paid to that Beneficiary's estate (or as stated in the application or by later designation). If no Beneficiary is named or alive upon the last death of the Measuring Life, and, if any, the Joint Measuring Life, We will make any remaining guaranteed payments to estate of Measuring Life, or the Joint Measuring Life, if any.

Change of Payee or Beneficiary
The Owner may change the Payee or Beneficiary designation during the lifetime of the last to survive of the Measuring Life and, if any, the Joint Measuring Life only by filing with Us at Our Office written notice in a form satisfactory to Us. A change of designation will take effect as of the date the written notice is signed, but We will not be liable for any payments made or action taken before We have received a copy of the written notice at Our Office.

Contestability
After the Contract has been in effect for two years from its Issue Date, We will not use material misstatements made in the application to contest this Contract.

Form 8.I.1000

Misstatement

If the Measuring Life's or, if any, Joint Measuring Life's date of birth or sex has been misstated, any future payments will be adjusted to the amount which the premium paid would have purchased at the correct age and sex. Age refers to the Measuring Life's age nearest birthday on the Issue Date. Any prior overpayments made or underpayments due will be recovered or paid out by Us either 1) by adjusting future payments to deduct any overpayment or to add any underpayment or 2) as mutually agreed to by Us and the Owner.

Nonassignability; Claims of Creditors

This Contract is not assignable. It cannot be transferred, assigned or pledged as collateral for a loan, and the payments provided under it are not assignable, cannot be changed, accelerated, or paid before the payment due date, and will be exempt from the claims of creditors to the maximum extent permitted by law. Further, no payments under this contract are payable in a single-sum value (i.e., payments are not commutable.)

Proof of Living/Death

Proof of Living: If the Payments Schedule on the Contract Specifications page provides for payments for so long as the Measuring Life, and if any, the Joint Measuring Life, shall live, We may require as a condition to making such payment, proof that the Measuring Life or the Joint Measuring Life is living on any payment date. Additionally, we may require proof that the Payee or Beneficiary, as the case may be, is living on the date which any payment is to be made. Such request will only be made pursuant to normal auditing procedures or if We have reason to believe that the Measuring Life, Joint Measuring Life, Payee or Beneficiary is dead and/or is not receiving the payments to which he or she is entitled. If proof is requested, then We will not make any further payments until satisfactory proof is received.

Proof of Death: If the Payments Schedule on the Contract Specifications page provides for payments of any remaining guaranteed payments by reason of the death of the Measuring Life and/or Joint Measuring Life, We may require proof of death of the Measuring Life and, if any, Joint Measuring Life before We will make such payment. Our obligation to the respective Joint Measuring Life, or Beneficiary, if any, or other successor in interest will only arise upon Our receipt of proof of death of the deceased Payee.

Any requested Proof of Living or Proof of Death must be submitted to Our Office.

Non-Participating

This Contract is non-participating. It does not share in our surplus earnings, so the Owner will not receive any dividends under it.

Entire Contract

This Contract is issued in consideration of the application and the payment of the Single Premium as shown in the application.

The entire Contract consists of this Contract, all attached pages and the application. All statements in the application will be considered to be made to the best knowledge and belief of the applicant and not as promises of truth. We will not use any statement to contest this Contract unless it is contained in the written application.

6

Form 8.I.1000

No sales representative or other person, except an authorized officer of Our company, may make or change any contract or make any binding promises about any contract on behalf of our company.  Any amendment, modification or waiver of any provision of this Contract will be in writing and may be made effective on behalf of Our company only by an authorized officer of Our company.



7

Form 8.I.1000